# Exhibit 1

 

November 17, 2015


U.S. Citizenship and Immigration Services
National Records Center, FOIA/PA Office
P. O. Box 648010
Lee's Summit, MO 64064-8010

uscis.foia@uscis.dhs.gov

**VIA First Class Mail and Electronic Mail**

To Whom It May Concern:

This letter constitutes a joint request to United States Citizenship and Immigration Services ("USCIS") pursuant to the Freedom of Information Act ("FOIA")[1] and DHS's FOIA regulations[2] (the "Request"), submitted by Human Rights Watch ("HRW") and the American Immigration Council ("Council"), collectively referred to as the "Requesters" (or "we," or "our").


## I.     Request For Information

The Requesters seek all records held by the USCIS Asylum Division and prepared by USCIS asylum officers relating to, and/or mentioning or referring to alleged due process violations or other alleged misconduct by Customs and Border Protection (CBP) (hereinafter called "alleged violations or other alleged misconduct"). "Alleged violations or other misconduct" means any alleged or asserted due process violations; alleged conduct inconsistent or in violation of agency policy or regulations; alleged conduct outside the scope of the law, allegations that CBP failed to record fear of return expressed by migrants at the border; and alleged intimidation, coercion and physical abuse. This request include all records referring to due process violations by CBP agents discovered by asylum officers during credible fear interviews with noncitizens.

---

[1]    5 U.S.C. § 552.

[2]    6 C.F.R. § 5.1 *et seq.*

For the time period beginning on October 1, 2006 and continuing through the present day, individual-level data on records of alleged violations or misconduct committed by CBP staff with variables about each instance of such violations or misconduct including but not limited to:

    i. The date the instance of an alleged violation or other misconduct was recorded;

    ii. The date on which the alleged violation or other misconduct occurred;

    iii. Border Patrol station or CBP port of entry in which the alleged violation or other misconduct took place;

    iv. Border Patrol sector in which the alleged violation or other misconduct took place;

    v. Nationality of the person who the record alleges suffered as a result of the alleged violation or other misconduct;

    vi. Immigration status of the person who the record alleges suffered as a result of the alleged violation or other misconduct;

    vii. Age or date of birth of the person who the record alleges suffered as a result of the alleged violation or other misconduct;

    viii. Gender of the person who the record alleges suffered as a result of the alleged violation or other misconduct

    ix. The nature of the due process alleged violation or other misconduct, including a full description of the allegation

    x. All communications between asylum officers and the Asylum Division headquarters regarding the alleged violation or other misconduct committed by CBP.

We request electronic copies of this data in a workable format, such as Excel, pursuant to 5 U.S.C. § 552 (a)(3)(C), but we also seek all records, as defined above, which respond to this request. We also request that we receive current translation files for any fields containing coded entries.

## II.    Request For Public Interest Fee Waiver

The Requesters respectfully request a waiver of fees to process this Request.  The Requesters are entitled to a fee waiver if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."[3]  The Request meets this standard, and the Requesters are thus entitled to a fee waiver.

---

[3]    5 U.S.C. § 552 (a)(4)(A)(iii); 6 C.F.R. § 5.11(k)(1).

A.     The Requesters are primarily engaged in disseminating information in order to inform the public about actual or alleged government activity.

DHS regulations set forth four factors to determine whether the disclosure of information is in the public interest: (1) whether the subject of the requested record concerns the operations or activities of the government; (2) whether the disclosure is likely to contribute to an understanding of government operations or activities; (3) whether the disclosure of the requested information will contribute to public understanding; and (4) whether the disclosure is likely to contribute "significantly" to public understanding of government operations or activities.[4]  This Request is subject to a fee waiver because it satisfies all four factors.

1.     The requested Information concerns the operations and activities of the government.

The Requesters seek information that would illustrate how the United States immigration officers with CBP are treating asylum seekers.  This implicates operations within the DHS, a government agency.  The requested information, therefore, clearly concerns the operations and activities of the government.

2.     Disclosure of the requested Information is likely to contribute to an understanding of government operations and activities.

This factor focuses on whether this Request will result in disclosure of meaningful Information that is not already public knowledge.[5]  The information sought by the Requesters is not in the public domain.[6] Without disclosure of the Information, it is difficult, if not impossible, for the public to clearly understand the subject government activities.

Second, this Request concerns Information that is of significant value to the public.  The Requesters seek to obtain and synthesize information about the characteristics and handling of instances of alleged misconduct and/or due process violations committed by CBP officials.  The general public will gain meaningful understanding of government policies and practices relating to treatment of migrants at U.S. borders.[7]  Among other things, the requested information will inform the public on the procedures for referring asylum seekers to credible fear interviews to assess their asylum claims.  The requested information, therefore, is likely to contribute to an understanding of government operations and activities.

---

[4]     6 C.F.R. § 5.11(k)(2)(i)-(iv).

[5]     6 C.F.R. § 5.11(k)(2)(ii); *see also Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Health & Human Servs.*, 481 F. Supp. 2d 99, 106 (D.D.C. 2006) (same).

[6]     *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1315 (D.C. Cir. 2003) (granting fee waiver where "nothing in the record before us suggests that the [information] has been disclosed to anyone").

[7]     *See Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Health & Human Servs.*, 481 F. Supp. 2d 99, 109 (D.D.C. 2006) (finding that public will gain meaningful information through request about "the individuals and organizations that influence, or attempt to influence, public opinion regarding HHS and its policies and programs").

      3.      Disclosure of the requested Information will contribute to public understanding.

This factor concerns how the requester will convey the information to the general public.[8] Courts will consider the requester's expertise in the subject area, and its ability to convey information to a reasonably broad audience interested in the subject matter.[9] First, the Requesters have significant experience in conducting research and disseminating information relating to human rights. HRW is an international organization that employs over 400 professionals, including journalists, lawyers, and academics. Similarly, the Council employs dedicated staff focused on advocating for sensible and humane immigration policies through targeted research and publications. These professionals work to uncover and report on human rights issues and immigration issues in the U.S. and around the world, often analyzing and disseminating information obtained through FOIA requests.[10]

Second, the Requesters have the capacity to disseminate the information gained from this request to a broad audience, making it available in print and on their respective websites.[11] Each of the Requesters publishes detailed reports[12] and issues press releases.[13] HRW and the Council regularly publish op-eds and blogs on their websites.[14] The Requesters also use their extensive media contacts to draw greater attention to the information they disseminate.[15] In this case, the

---

[8]    6 C.F.R. § 5.11(k)(2)(iii); *see also Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Whether the releasable records are likely to contribute to the general public's understanding of the agency's operations or activities (*e.g.*, how will the requester convey the information to the general public) . . . ."); *Nat'l Sec. Counselors v. Dep't of Justice*, No. 13-CV-0556 (TSC), 2015 WL 674289, at *10 (D.D.C. Feb. 18, 2015) ("In evaluating this factor, '[a] requester's expertise in the subject area and ability and intention to effectively convey information to the public shall be considered.'") (quoting 28 C.F.R. 16.11(k)(2)(iii)).

[9]    6 C.F.R. § 5.11(k)(2)(iii).

[10]    *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) (holding that plaintiff satisfied its burden where it "described several methods it uses to make information available to the public [and] it has a record of conveying to the public information obtained through FOIA requests, and it has stated its intent to do so in this case").

[11]    *See Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Health & Human Servs.*, 481 F. Supp. 2d 99, 116 (D.D.C. 2006) (plaintiff demonstrated intent and capacity to disseminate through reports, memoranda, and its website).

[12]    *Reports*, HUMAN RIGHTS WATCH, http://www.hrw.org/publications/reports; *Research and Publications*, AMERICAN IMMIGRATION COUNCIL, http://www.immigrationpolicy.org/research-publications.

[13]    *News Releases*, HUMAN RIGHTS WATCH, http://www.hrw.org/news/list/40 (last visited June 22, 2015); *Press Releases*, AMERICAN IMMIGRATION COUNCIL, http://www.americanimmigrationcouncil.org/news-media/press-releases.

[14]    *Commentary*, HUMAN RIGHTS WATCH, http://www.hrw.org/news/list/41 (last visited June 22, 2015); *Immigration Impact*, AMERICAN IMMIGRATION COUNCIL. http://immigrationimpact.org.

[15]    From January 1, 2014 to January 1, 2015, Human Rights Watch appeared in Agence France Press 1,257 times, Reuters News 1,917 times, Associated Press Newswires 974 times, All Africa 1,789 times, CNN Newswire 2,185 times, BBC News 468 times, *The Guardian* (UK) 365 times, and *The New York Times* 1,124 times. Additionally, Human Rights Watch often appears in major US papers such as *The Washington Post*, *The Wall Street Journal*, *USA Today*, *The Pittsburgh Post-Gazette*, *The Los Angeles Times*, *The Chicago Tribune*,

Requesters seek the requested information to publish and disseminate a report or other publication(s) to better inform the public and shape government policy concerning the treatment of asylum seekers in expedited removal.  The requested information, therefore, will contribute to public understanding.

> 4.   Disclosure of the requested Information is likely to contribute significantly to public understanding of government operations and activities.

This factor concerns the significance of the Information's contribution to the general public's understanding, as compared to the level of public understanding before the disclosure.[16]  This Request concerns the U.S. treatment of asylum seekers at its borders. Significant understanding of government activities will be gained because there is no comparable source of information or analysis of complaints heard by USCIS officers by would-be asylum seekers.[17] The information is likely to increase the public's understanding by revealing alleged CBP abuses reported to USCIS asylum officers.  This is important to provide insight to the public about how its borders are being managed and operated by each agency, and how its tax dollars are being expended.[18] This data will also be published in order to increase the public's understanding of the federal government's operations, and to help inform ongoing public and Congressional debate as to where, and to what extent, the United States should be allocating its resources.  The requested Information, therefore, is likely to contribute significantly to public understanding of government operations and activities.

> B.   The Request is not for commercial purposes.

DHS regulations set forth two factors to determine whether the disclosure of information is for commercial purposes:   (1) whether the requester has a commercial interest that would be furthered by the requested disclosure; and (2) if so, whether any identified commercial interest of the requester is sufficiently large, in comparison with the public interest in disclosure, that

---

*The Houston Chronicle*, and others.  Internationally, Human Rights Watch has been cited by *The International Herald Tribune*, *Der Spiegel* (Germany), *The Toronto Star* (Canada), *The Jakarta Post* (Indonesia), *El Pais* (Spain), *Le Monde* (France), *The Sydney Morning Herald* (Australia), *The Times* (London), *Le Progres Egyptien* (Egypt), *Mail and Guardian* (South Africa), *The Ottawa Citizen* (Canada), as well as hundreds of other print news sources around the world. Likewise, the Council has received significant media coverage.  *See*, *e.g.*, *The Council in the News*, AMERICAN IMMIGRATION COUNCIL, http://www.americanimmigrationcouncil.org/news-media/in-the-news.

[16]   6 C.F.R. § 5.11(k)(2)(iv); *see also Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("The significance of the contribution to the general public's understanding of the agency's operations or activities (*e.g.*, is the information contained in the releasable records already available to the general public)").

[17]   *See Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Health & Human Servs.*, 481 F. Supp. 2d 99, 117 (D.D.C. 2006) (holding that plaintiff fulfilled burden of showing that disclosure will significantly contribute to public understanding in part because "there has been no comparable report specifically addressing what CREW seeks to discover from the requested documents").

[18]   *Prison Legal News v. Lappin,* 436 F. Supp. 2d 17, 26 (D.D.C. 2006) (finding informative value in requested information that would "provide insight to the public about how its federal prisons are being managed and operated, and how its tax dollars are being expended").

disclosure is primarily in the commercial interest of the requester.[19]  This Request satisfies both factors, and thus the Requesters are entitled to a fee waiver.

The Requesters seek the Information in order to publish a report that will educate the public and promote the protection of civil liberties, human rights, and the fair and just administration of the immigration laws.  We do so without a private commercial interest. Each Requester is or represents a nonprofit organization financed through contributions from private individuals, foundations, or a parent institution.  Information gained from the present Request will be analyzed and disseminated by the Requesters without charge to consumers, such as by media reports or freely on their websites. Because the Requesters' primary interest is in distributing useful information to the public, granting a fee waiver in this case would fulfill Congress' legislative intent of liberally construing in favor of waivers of noncommercial requesters.[20]  Our request, therefore, is submitted without a commercial purpose and is entitled to a fee waiver.


**III.     Response**

Please submit the requested Information to:

> Clara Long, Researcher
> US Program, Human Rights Watch
> 350 Sansome St., Suite 1000
> San Francisco, CA  94104
> E-mail: longc@hrw.org

**IV.     Certification**

We certify that the above statements are true and correct to the best of our knowledge and belief.

*[Signatures on following page]*

---

[19]   6 C.F.R. § 5.11(k)(3)(i)-(ii).

[20]   *See McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1284 (9th Cir. 1987) (quoting 132 CONG. REC. 27, 190 (1986) (Sen. Leahy)) ("Congress amended FOIA to ensure that it be 'liberally construed in favor of waivers of noncommercial requesters'").

Signed:

_____

Clara Long
Researcher, US Program
Human Rights Watch
350 Sansome St., Suite 1000
San Francisco, CA  94104
E-mail: longc@hrw.org


_____

Guillermo Cantor
Deputy Director for Research
American Immigration Council
1331 G Street NW
Washington, DC  20005
E-mail: gcantor@immcouncil.org

# Exhibit 2

**U.S. Department of Homeland Security**
National Records Center
P.O. Box 648010
Lee's Summit, MO  64064-8010



U.S. Citizenship
and Immigration
Services

November 24, 2015

COW2015000978

Clara Long
US Program, Human Rights Watch
350 Sansome St., Suite 1000
San Francisco, CA 94104

Dear Clara Long:

We received your request for information relating to USCIS asylum records of due process violations or misconduct by Customs and Border Patrol on November 24, 2015. The time frame for records sought is October 1, 2006 to present.  You have specifically requested the following information in a workable format, such as Excel:

- The date the instance of an alleged violation or other misconduct was recorded;
- The date on which the alleged violation or other misconduct occurred;
- Border Patrol station or CBP port of entry in which the alleged violation or other misconduct took place;
- Border Patrol sector in which the alleged violation or other misconduct took place;
- Nationality of the person who the record alleges suffered as a result of the alleged violation or other misconduct;
- Immigration status of the person whom the record alleges suffered as a result of the alleged violation or other misconduct;
- Age or date of birth of the person who the record alleges suffered as a result of the alleged violation or other misconduct;
- Gender of the person who the record alleges suffered as a result of the alleged violation or other misconduct;
- The nature of the due process alleged violation or other misconduct, including a full description of the allegation,
- All communication between asylum officers and the Asylum Division headquarters regarding the alleged violation or other misconduct committed by CBP.

Your request is being handled under the provisions of the Freedom of Information Act (5 U.S.C. § 552). It has been assigned the following control number: COW2015000978.  Please cite this number in all future correspondence about your request.

In accordance with Department of Homeland Security Regulations (6 C.F.R. § 5.4(a)), USCIS uses a "cut-off" date to delineate the scope of a FOIA request by treating records created after that date as not responsive to that request. Therefore, in determining which records are responsive to your request, we will only include records in the possession of this agency as of November 24, 2015, the date we began the search for records.

www.uscis.gov

COW2015000978
Page 2

We respond to requests on a first-in, first-out basis and on a multi-track system. Your request has been placed in the complex track (Track 2). You may wish to narrow your request to a specific document in order to be eligible for the faster track. To do so, please send a written request, identifying the specific document sought, to the address above. We will notify you if your request is placed in the simple track.

In accordance with Department of Homeland Security Regulations (6 C.F.R. § 5.3(c)), your request is deemed to constitute an agreement to pay any fees that may be chargeable up to $25.00. All applicable fees under 6 C.F.R. §5.11 may be charged. Your request for a fee waiver has been granted.

Because of unusual circumstances we may not be able to process your request within the statutory time limit, therefore, it will be necessary to extend the time limit for processing beyond the ten working day extension period due to the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request. You may wish to modify your request so that it can be processed within the statutory time limit or arrange an alternative time period with our office. Regardless of any delay, your FOIA/PA request will be complied with as accurately as possible.

This office will be providing your records on a Compact Disc (CD) for use on your personal computer. The CD is readable on all computers through the use of Adobe Acrobat software. A version of Adobe Acrobat will be included on the CD. Your records can be viewed on your computer screen and can be printed onto paper. Only records 15 pages or more are eligible for CD printing. To request your responsive records on paper, please include your control number and write to the above address Attention: FOIA/PA Officer, or fax them to (816) 350-5785.

You may check the status of your FOIA request online, at www.uscis.gov. Click on "FOIA Request Status Check" located on the left side of the web page under "Other Services", and follow the instructions. Please be aware that the National Records Center no longer accepts FOIA/PA related questions directly by phone.

All FOIA/PA related requests, including address changes, must be submitted in writing and be signed by the requester. Please include the control number listed above on all correspondence with this office. Requests may be mailed to the FOIA/PA Officer at the PO Box listed at the top of the letterhead, or sent by fax to (816) 350-5785. You may also submit FOIA/PA related requests to our e-mail address at uscis.foia@uscis.dhs.gov.

Sincerely,

Jill A. Eggleston
Director, FOIA Operations

**Exhibit 3**

U.S. Department of Homeland Security
National Records Center
P.O. Box 648010
Lee's Summit, MO  64064-8010



**U.S. Citizenship
and Immigration
Services**

December 13, 2016                                            **COW2015000978**

Clara Long
US Program, Human Rights Watch
350 Sansome St., Suite 1000
San Francisco, CA  94104

Dear Clara Long:

This is in response to your Freedom of Information Act/Privacy Act (FOIA/PA) request received in this office November 24, 2015 regarding USCIS asylum records of due process violations or misconduct by CBP.

We have completed the review of all documents and have identified 229 pages that are responsive to your request.  Enclosed are 54 pages released in their entirety and 174 pages released in part.  We are withholding 1 page in full.  In our review of this page, we have determined that it contains no reasonably segregable portion(s) of non-exempt information.  We have reviewed and have determined to release all information except those portions that are exempt pursuant to 5 U.S.C. § 552 (b)(5), (b)(6), and (b)(7)(C) of the FOIA.

Exemption (b)(5) provides protection for inter-agency or intra-agency memoranda or letters, which would not be available by law to a party other than an agency in litigation with the agency.  The types of documents and/or information we have withheld under this exemption may consist of documents containing pre-decisional information, documents or other memoranda prepared in contemplation of litigation, or confidential communications between attorney and client.

Exemption (b)(6) permits the government to withhold all information about individuals in personnel, medical and similar files where the disclosure of such information would constitute a clearly unwarranted invasion of personal privacy.  The types of documents and/or information we have withheld may consist of birth certificates, naturalization certificates, drivers' licenses, social security numbers, home addresses, dates of birth, or various other documents and/or information belonging to a third party that are considered personal.

Exemption (b)(7)(C) provides protection for personal information in law enforcement records, which could reasonably be expected to constitute an unwarranted invasion of personal privacy.  We have withheld information relating to third-party individuals.  The types of documents and/or information we have withheld could consist of names, addresses, identification numbers, telephone numbers, fax numbers, or various other documents that are considered personal.

COW2015000978
Page 2

As a matter of administrative discretion, we are releasing computer codes found on system screen prints previously withheld under exemption b(2). There may be additional documents that contain discretionary releases of exempt information. We will identify discretionary releases within the record. These discretionary releases do not waive our ability to invoke applicable FOIA exemptions for similar or related information in the future.

The enclosed record consists of the best reproducible copies available. Certain pages may contain marks that appear to be blacked-out information. Such black marks would have been present prior to our receipt of the file and are not information we have withheld under the provisions of the FOIA or PA.

If you wish to appeal this determination, you may write to the USCIS FOIA/PA Appeals Office, 150 Space Center Loop, Suite 500, Lee's Summit, MO 64064-2139, within 90 days of the date of this letter. Both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

The National Records Center does not process petitions, applications or any other type of benefit under the Immigration and Nationality Act. If you have questions or wish to submit documentation relating to a matter pending with the bureau, you must address these issues with your nearest District Office.

All FOIA/PA related requests, including address changes, must be submitted in writing and be signed by the requester. Please include the NRC number listed above on all correspondence with this office. Requests may be mailed to the FOIA/PA Officer at the PO Box listed at the top of the letterhead, or sent by fax to 816-350-5785. You may also submit FOIA/PA related requests to our e-mail address at uscis.foia@uscis.dhs.gov.

Sincerely,

Jill A. Eggleston
Director, FOIA Operations

Enclosure(s)

# Exhibit 4

(b)(6)

**Subject:**                    Border Patrol Issues in CF
**Attachments:**            CBP Issues in CF - 08-11-2014.xlsx

As we have mentioned to a few of you _____ and I have been informally collecting information during our QA detail on problematic Border Patrol practices that arise in the credible fear context. Our intern, _____ was tremendously helpful on this project.

Attached is a spreadsheet which compiles this information. As you will see, most of the excerpts are from credible fear interviews, but a few are from the I-867A/B directly. We were aiming to capture examples of misconduct. The problems we encountered vary from the applicant stating he/she was never asked by Border Patrol about his/her fear of return, to an applicant stating that she was made fun of by officers because she is transgender and was forced to sign documents. The spreadsheet is intended to qualitatively illustrate the various issues we encountered. A few of the more alarming examples are highlighted. Our collection of this data was by no means scientific, the sample of cases is not a representative sample, and the chart doesn't reflect every case we reviewed where there were no apparent issues. Thus, a comparison of the number of "no apparent problem" cases with the various problem categories would be misleading. Additionally, some cases fell into more than one problem category.  However, given that more than just a few cases presented problems, we think the information can still be helpful to illustrate that there are significant issues in how some Border Patrol officers are screening individuals.

We are hoping you all have ideas of how this information can be used/who needs to see it to help fix these problematic Border Patrol practices. We noticed that DHS CRCL was recently collecting examples from AILA of individuals who were denied access to credible fear interviews (http://www.aila.org/content/default.aspx?bc=48414). Also note that we have been collecting this information on an informal basis, and have not discussed this with QA.

Let us know if you have any questions or would like to discuss any of this.

(b)(6)

# Exhibit 5

Hi,

I just went through the final version of the spreadsheet from _____, which looks very good. I'm not sure where we are in terms of next steps, but here's the breakdown:

1016 cases reviewed
638 with no apparent problem ( 63%)
88 where the applicant was not asked about fear (9%)
83 where the questioning was too narrow (8%)
65 where the CBP officer spoke inappropriately (6%)
23 where the CBP officer spoke in English/language issue (2%)
183 where CBP did not record the applicant's expressed fear (18%)

63% with no apparent problems is ridiculously low, even if some of the applicants are being untruthful when confronted by the APSO.

I haven't been adding any of my cases since we sent the second round to _____ except for one this afternoon which was particularly egregious (CBP mocked a transgender applicant for hours and refused to record her fear). I know that messes with the "random sampling" a bit, but I really felt someone needs to see that. It's highlighted in the excel sheet.

I think we have enough data to move forward with this, although I'm happy to do some more recording (or send it to _____ if you guys would like to keep going. I know this was kind of Hunter's thing so I'm not sure who we work with on it now. At a minimum, one of us should Check Whitney's classifications before we pass it up, which I'm happy to do. Thoughts?

Best,

(b)(6)

# Exhibit 6



NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

**Matthew A. Richards**
*Partner*
T 415-984-5093
mrichards@nixonpeabody.com

One Embarcadero Center, 18th Floor
San Francisco, CA  94111-3600
415-984-8200

September 25, 2017

*VIA FEDEX AND EMAIL*

USCIS FOIA/PA Appeals Office
uscis.foia@uscis.dhs.gov
150 Space Center Loop, Suite 500
Lee's Summit, MO 64064-2139
Attn: Alan D. Hughes

RE:   **Human Rights Watch / American Immigration Council FOIA Appeal Follow-Up**
      **FOIA Appeal Reference No. APP2017000293**
      **FOIA Reference No. COW2015000978**

Dear Mr. Hughes:

We write further to our March 10, 2017, Appeal Letter on behalf of our clients, Human Rights Watch and the American Immigration Council (collectively, the "Requesters"), in the above-referenced matter, and your Appeal Determination letter of March 14, 2017.  *See* **Attachments A & B**.  In the Appeal Determination, you acknowledged the Requesters' Original FOIA Request ("Original Request") for records[1] and "**decided to remand [the] request to the National Records Center for a further search**."  We understand your decision to remand the Original Request to constitute an acknowledgment of the deficiencies with the original USCIS search and production of records, and a grant of the Requesters' administrative appeal.

In light of the foregoing, the Requesters expect that the new search and production of records will cure each of the deficiencies identified in their Appeal Letter.  Specifically, the Requesters expect that with respect to both the original production and the further search and production, USCIS will do each of the following:

- *Use Proper Time Parameters for Search* – Conduct an appropriate search for any and all records referencing or mentioning alleged due process violations or other alleged misconduct by CBP, according to the parameters described in the Original Request, **from October 1, 2006, through the date on which USCIS conducts its "further search".**  When the Requesters identified December 13, 2016, as the date through which

---

[1] In the Original Request, dated November 24, 2015, the Requesters sought all USCIS Asylum Division records pertaining to alleged due process violations or other alleged misconduct by CBP.  *See* FOIA Case No. COW2015000978.

4819-6127-6998.3

USCIS FOIA/PA Appeals Office
Attn: Alan D. Hughes
September 25, 2017
Page 2

NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

they would accept responsive documents, they did so on the assumption that the further search would be promptly conducted. <u>Because USCIS has failed, over the past six months, to undertake a prompt and adequate search, the Requesters hereby demand that USCIS produce responsive records in existence as of the date of its search, and that USCIS identify the date upon which its further search is performed.</u> *See Pub. Citizen v. Dep't of State*, 276 F.3d 634, 644 (D.C. Cir. 2002); *Judicial Watch, Inc. v. Dep't of Energy*, 310 F. Supp. 2d 271, 305 (D.D.C. 2004).

- *Produce Complete & Comprehensible Documents* – Produce each responsive document in an original, complete, and comprehensible format.

- *Appropriately Use Exemption 6* – Appropriately limit its use of Exemption 6 to redact only such information as is appropriate and actually subject to that exemption—*i.e.*, personal identifying information such as names, addresses, and Alien Nos., if USCIS is able to make a particularized showing that Exemption 6 should apply.

- *Grant Fee Waiver* – Determine that the Requesters qualify for a fee waiver with respect to the new search and production of records.

If for any reason USCIS does not intend to proceed as outlined in the Requesters' Appeal Letter and summarized above, please contact us immediately. Otherwise, we will expect the original production and any documents identified in the further search to be reproduced subject to these parameters.

We also note that the Original Request was remanded to the National Records Center for further searching over six months ago. To date, neither Human Rights Watch nor the American Immigration Council has received an update regarding the timing of production, much less actual, additional records. We therefore request that USCIS immediately identify its anticipated production date. Thank you for your ongoing attention to this matter.

Sincerely,

Matthew A. Richards

MAR
Attachments

Human Rights Watch / American Immigration Counsel FOIA Appeal
Appeal No. APP2017000293
Reference No. COW2015000978

# ATTACHMENT A



NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

**Matthew A. Richards**
*Partner*
T 415-984-5093
mrichards@nixonpeabody.com

One Embarcadero Center, 18th Floor
San Francisco, CA  94111-3600
415-984-8200

March 10, 2017

*VIA FEDEX AND EMAIL*

USCIS FOIA/PA Appeals Office
uscis.foia@uscis.dhs.gov
150 Space Center Loop, Suite 500
Lee's Summit, MO 64064-2139

RE:   **Human Rights Watch / American Immigration Counsel FOIA Appeal
      Reference No. COW2015000978**

Dear FOIA/PA Appeals Officer:

Nixon Peabody LLP represents Human Rights Watch ("HRW") and the American Immigration
Council ("Council") (collectively, the "Requesters") with respect to the above-captioned
Freedom of Information Act ("FOIA") request originally submitted to U.S. Citizenship and
Immigration Services ("USCIS") on November 17, 2015 (the "Request"). **Ex. A.** The Request
sought all USCIS Asylum Division records relating to, mentioning, or referring to "alleged due
process violations or other alleged misconduct" by Customs and Border Protection ("CBP")
from October 1, 2006, through the present,[1] and further sought a fee waiver, which the USCIS
granted in its letter of November 24, 2015, acknowledging receipt of the Request. **Ex. B.**

Requesters now timely appeal from USCIS' response letter and partial release of records of
December 13, 2016 (collectively, "Final Response"). **Ex. C.** For each of the reasons described
below, USCIS' Final Response is deficient and plainly fails to satisfy its FOIA obligations.

**USCIS Failed to Conduct an Appropriate Search for Responsive Records.**

FOIA requires that, prior to providing a final response, agencies must conduct "a search
reasonably calculated to *uncover all relevant documents*." *Weisberg v. U.S. Dep't of Justice,*
705 F.2d 1344, 1351 (D.C. Cir. 1983) (emphasis added). Accordingly, where an agency has

---

[1] "Alleged due process violations or other alleged misconduct" is defined in the Request as "any alleged or asserted
due process violations; alleged conduct inconsistent or in violation of agency policy or regulations; alleged conduct
outside the scope of the law, allegations that CBP failed to record fear of return expressed by migrants at the
border; and alleged intimidation, coercion and physical abuse." The Request also specifically stated that the
definition includes "all records referring to due process violations by CBP agents discovered by asylum officers
during credible fear interviews with noncitizens."

USCIS FOIA/PA Appeals Office
Reference No. COW2015000978
March 10, 2017
Page 2

NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

reason to know that responsive documents are likely located in a particular office or database, it is obligated to conduct a search for responsive documents in that location. *See Inst. for Policy Studies v. C.I.A.*, 885 F. Supp. 2d 120, 137-138 (D.D.C. 2012) (finding that CIA did not fulfill its obligation to conduct a search for relevant documents where it failed to search three of five directorates likely to contain responsive records). Courts will not tolerate restrictive interpretations of the scope of a request that might lead to searches that exclude files where responsive records might be located. *See, e.g., Pub. Emps. for Envtl. Responsibility v. U.S. Int'l Boundary & Water Comm'n*, 842 F. Supp. 2d 219, 224-26 (D.D.C. 2012) (finding that agency improperly limited scope of request when it did not search for all documents related to subject of request); *Jefferson v. Bureau of Prisons*, No. 05-848, 2006 WL 3208666 at *6 (D.D.C. Nov. 7, 2006) (finding search not reasonable when agency searched only its Central Records System database, where search of "I" drive database was warranted by scope of request).

Here, USCIS conducted an insufficient and legally inadequate search for responsive records, as evidenced by its failure to provide any records created prior to 2013. Not a single document in the production is dated during the time period 2006-2012. Nor do any of the records produced by USCIS refer to a relevant CBP incident that took place from 2006 through 2011. So far as HRW and the Council have been able to decipher the production, it appears that each incident of alleged CBP misconduct documented in the production occurred between November 25, 2012, and January 17, 2016.

It defies belief that complaints to Asylum Officers alleging CBP due process violations or other misconduct would not have been documented by USCIS *in any fashion* until 2013. In fact, the Council has published a report covering 809 complaints of alleged abuse lodged against CBP agents between January 2009 and January 2012 alone, and is presently reviewing additional complaints for a planned update to the report. *See* Daniel E. Martínez, Ph.D., Guillermo Cantor, Ph.D., and Walter A. Ewing, Ph.D., *No Action Taken: Lack of CBP Accountability in Responding to Complaints of Abuse*, AMERICAN IMMIGRATION COUNCIL (May 2014), https://www.americanimmigrationcouncil.org/sites/default/files/research/No%20Action%20Taken_Final.pdf. Despite this strong evidence of allegations of CBP abuses during the relevant time period from 2006 to the present, there is no evidence that USCIS searched for records created prior to 2013. USCIS must remedy this deficiency.

**USCIS Attempted to Impose an Improper Time Limitation on Its Search.**

Absent extraordinary circumstances, USCIS must provide responsive records that were in existence as of the date it conducted its search. *See Pub. Citizen v. Dep't of State*, 276 F.3d 634, 644 (D.C. Cir. 2002). As the Final Response identifies no such extraordinary circumstances, USCIS has a duty to provide all records that were in existence as of the date it conducted the search. USCIS must also identify the date of that search. *See Judicial Watch, Inc. v. Dep't of Energy*, 310 F. Supp. 2d 271, 305 (D.D.C. 2004).

USCIS FOIA/PA Appeals Office
Reference No. COW2015000978
March 10, 2017
Page 3

NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

Here, USCIS improperly attempted to set November 24, 2015, as the cut-off date for its search on that grounds that it was "the date we began the search for records." **Ex. B.** The search clearly did not end on the date identified by USCIS. The document production contains a document fragment of an Asylum Officer's notes referring to a CBP interview conducted on January 17, 2016. *See* **Ex. D** [Bates 161-162]. Although the Asylum Officer's notes were undated, they were clearly created after the January 17, 2016, CBP interview they reference, to say nothing of the arbitrary November 24, 2015, cut-off date. Thus, the USCIS production itself provides the clearest evidence that the date selected by USCIS was arbitrary and bore no relation to the timing of its actual search. USCIS plainly did not abide by its arbitrary cut-off date in conducting its search; it cannot do so now. USCIS is required to identify the *actual* date of its search and to produce all records in existence as of that date. *See Pub. Citizen*, 276 F.3d at 644; *Judicial Watch*, 310 F. Supp. 2d at 305.

Because the Final Response is dated December 13, 2016, the Requesters will accept it as the date through which responsive records must be produced when USCIS conducts its new search pursuant to this Appeal.

**USCIS' Production is Incomplete, Incoherent, and/or Indecipherable.**

"The FOIA requires a federal agency to release all records responsive to a request for production, 5 U.S.C. § 552(a)(3)(A), unless such records falls within one of the well-defined exemptions listed in § 552(b)." *Am. Civil Liberties Union v. U.S. Dept. of Homeland Sec.*, 738 F. Supp. 2d 93, 99 (D.D.C. 2010); 5 U.S.C. § 522(a)(3) ("each agency, upon any request for records… shall make the records promptly available to any person"). FOIA also requires that "an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format." 5 U.S.C. §552(a)(3)(B).

USCIS has failed to produce all records responsive to the Request for the additional reason that the records actually produced are incomplete, incoherent, and/or indecipherable. For example, USCIS has astonishingly *cut-and-pasted* small excerpts from clearly responsive documents, interviews, and/or records, *without providing those complete records. See, e.g.,* **Ex. E** [Bates 30-37]. Needless to say, this is inappropriate under any reading of the FOIA statute. *Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review*, 830 F.3d 667, 670 (D.C. Cir. 2016) ("[W]e find no statutory basis for redacting ostensibly non-responsive information from a record deemed responsive. Under the statutory framework, once the government concludes that a particular record is responsive to a disclosure request, the sole basis on which it may withhold particular information within that record is if the information falls within one of the statutory exemptions from FOIA's disclosure mandate. But the government in this case, after determining that records were responsive to AILA's request, redacted discrete information within the records on the basis of non-responsiveness even if no statutory exemption shielded the information from disclosure. That approach cannot be squared with the statutory scheme.").

USCIS FOIA/PA Appeals Office
Reference No. COW2015000978
March 10, 2017
Page 4

NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

USCIS' failure to provide complete records is especially inappropriate here, given that the Requesters sought "all records" that reference or mention any alleged due process violations or other alleged misconduct by CBP.  The Request plainly sought *complete* copies of any records referencing or mentioning a CBP incident in their *original formats*.  This is evidenced by the fact that the Requesters specifically requested that USCIS provide identifying details about each alleged incident of CBP misconduct—including, *inter alia*, the date and location of the alleged incident, nationality of the individual involved in the incident, description of the incident etc.  Equally plainly, the Request did not ask USCIS to cut-and-paste only those portions of documents describing incidents of CBP misconduct while omitting the balance of those document, which would presumably provide context regarding the allegations.  In fact, it appears that USCIS intentionally omitted relevant details, because in at least one instance, it inadvertently produced such information (along with information subject to FOIA exemption (b)(6)) despite its cut-and-paste efforts.  *See* **Ex. E** [Bates 37].

USCIS inappropriately chopped-up its production in other ways beyond improper excerpting.  Only certain pages of documents and communications were produced, while the remainder of these documents was omitted—*e.g.* only page 5 of a multi-page document has been produced.  *See* **Ex. F** [Bates 214, page 5 only]; *see also* **Ex. G** [Bates 182, page 3 only]; **Ex. H** [Bates 197, page 2 only].  In fact, USCIS has essentially admitted in its Final Response that its production was improper, as it specifically stated that it had "completed the review of *all documents* and ha[s] identified *229 pages* that are responsive to [the Request]."  **Ex. C** (emphasis added).  The Requesters specifically requested all responsive *documents*, not just such pages as USCIS deems it convenient to produce.  By cutting and pasting only certain portions of interviews, and producing only certain pages of documents, USCIS has omitted identifying details about each alleged incident (*i.e.*, dates, locations, nationality, etc.), all of which were specifically requested.  In doing so, USCIS has rendered a large portion of the production indecipherable and functionally useless.  In many cases it is impossible to determine whether two documents refer to the same CBP incident, or to different ones.

Other portions of the production are completely incoherent.  For example, USCIS has produced a spreadsheet that is presumptively responsive to the Request.  *See* **Ex. I** [Bates 39-51].  Yet this spreadsheet was not accompanied by any documentation describing the organization of the data or providing context of any kind that would permit the Requesters to analyze it.  Unless some instruction or explanation for the organization of such records is provided, they are completely meaningless.  Incomplete and unresponsive records do not satisfy USCIS' obligations under FOIA.  USCIS did not object to the Request or refuse to produce responsive documents, except on the limited grounds identified in its Final Response.  *See* **Ex. C**.  If a USCIS record *mentions or refers to* "alleged due process violations or other alleged misconduct" by CBP, USCIS is obligated to produce a copy of that record, in its entirety, as requested.  *See* **Ex. A**.

USCIS FOIA/PA Appeals Office
Reference No. COW2015000978
March 10, 2017
Page 5

NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

**USCIS Has Improperly Redacted Material Under FOIA Exemption 6.**

FOIA Exemption 6, 5 U.S.C. § 552(b)(6), protects information about individuals in "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." Exemption 6 is "narrowly construed." *See John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989); *see also U.S. Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976). Exemption 6 typically cannot be asserted when the private information cannot be linked to a particular individual. *See, e.g., Arieff v. U.S. Dep't of the Navy*, 712 F.2d 1462, 1467-68 (D.C. Cir. 1983) (finding no protection under Exemption 6 for list of drugs ordered for use by some members of large group). Under Exemption 6, "the presumption in favor of disclosure is as strong as can be found anywhere in the Act." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002); *see Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 261 (D.C. Cir. 1982) (explaining that Exemption 6 "tilt[s] the balance of disclosure interests against privacy interests in favor of disclosure.").

For Exemption 6 to apply, first, the information must be contained in personnel, medical or "similar"[2] files. *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 598 (1982). Second, the Exemption is warranted if disclosure "would compromise a substantial privacy interest" and not just a "*de minimis*" privacy interest. *See Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989). If the privacy interest is not "significant" then "FOIA demands disclosure." *Id.* A third factor is whether disclosure would serve the "core purpose of FOIA" by "contributing significantly to public understanding of the operations or activities of the government." *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 495 (1994). Finally, Exemption 6 only applies if upon a balancing of private and public interests, there is a "clearly unwarranted invasion of personal privacy." *See Reporters Comm.*, 489 U.S. at 766. The balancing test is to be conducted with a presumption in favor of disclosure. *See Rose*, 425 U.S. at 366.

In *AILA*, for example, the court rejected the Executive Office for Immigration Review's blanket redaction of immigration judges' names from all disclosed records. *Am. Immigration Lawyers Ass'n*, 830 F.3d at 670 ("The government reasoned that, as a blanket matter, the privacy interest of immigration judges in avoiding disclosure of their names necessarily outweighs the public's interest in learning any of the judges' names. We conclude that the government's across-the-board approach cannot be sustained in light of the variety of privacy and public interests that may be at stake in connection with the disclosure of an immigration judge's name. We therefore remand for a more individualized inquiry into the propriety of redacting judges' names."). Here, USCIS has taken the same categorical approach to redacting the identities of any and all DHS personnel named in the document production. This categorical, across-the-

---

[2] A "similar file" is one that contains information "such as place of birth, date of birth, date of marriage, employment history, and comparable data" or information that is "personal to the individual therein." *Wash. Post*, 456 U.S. at 600; *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 758 (1989).

4816-1384-6597.3

USCIS FOIA/PA Appeals Office
Reference No. COW2015000978
March 10, 2017
Page 6

NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

board approach does not satisfy USCIS' burden to justify its Exemption 6 redactions. *Id.* at 676.

USCIS has not only inappropriately, globally redacted the identifying information of DHS personnel, it has redacted the dates and/or subject lines from a number of email communications and memos. The date that a communication was sent is simply not subject to Exemption 6 protection, nor is its subject line. There is nothing personal in nature about a date. *See Reporters Comm*, 489 U.S. at 758 (explaining that a "similar file" is one that is "personal to the individual therein."). Additionally, huge blocks of information—including whole emails in some instances—have been excised under the guise of Exemption 6. *See, e.g.* **Ex. J** [Bates 161-62, 211, 226].[3] HRW and the Council are entitled to all responsive information that does not fall within a validly asserted exemption, and therefore request that the revised USCIS production in response to this Appeal: (1) rectify the Exemption 6 over-designation issues identified herein with respect to the existing production; and (2) make only such use of Exemption 6 as is proper with respect to the additional documents that USCIS is obligated to produce.

\*     \*     \*

USCIS has determined that the Requesters qualify for a fee waiver with respect to this Request. Therefore, HRW and the Council request that USCIS comply with its obligations under FOIA, at no charge to them, by:

- conducting an appropriate search for any and all records referencing or mentioning alleged due process violations or other alleged misconduct by CBP from 2006 through December 13, 2016, according to the parameters described in the original Request;

- producing each responsive document in an original, complete, and comprehensible format; and

- appropriately limiting its use of Exemption 6 to redact only such information as is appropriate and actually subject to that exemption (*i.e.*, personal identifying information such as names, addresses, and Alien Nos., if USCIS is able to make a particularized showing that Exemption 6 should apply).

---

[3] Exhibit J is intended to be representative, not exhaustive, of the instances in which USCIS has apparently over-designated on the basis of Exemption 6. The following Bates ranges of the production suffer from the same problem: 1, 3-9, 11, 14-17, 19, 21, 38, 52-63, 66-70, 72-73, 79-102, 104-107, 109-121, 123-129, 130-133, 135-136, 138, 140, 142, 145-147, 150-154, 158-159, 161-162, 168-169, 173, 184-186, 197-199, 211-212, 226, 228.
4816-1384-6597 3

NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

We are committed to ensuring that HRW and the Council receive all records to which they are entitled under FOIA, and will take all steps necessary to protect their interests.  We look forward to your reply.

Sincerely,

Matthew A. Richards

MAR

Human Rights Watch / American Immigration Counsel FOIA Appeal
Reference No. COW2015000978

# EXHIBIT A

 

November 17, 2015

U.S. Citizenship and Immigration Services
National Records Center, FOIA/PA Office
P. O. Box 648010
Lee's Summit, MO 64064-8010

uscis.foia@uscis.dhs.gov

**VIA First Class Mail and Electronic Mail**

To Whom It May Concern:

This letter constitutes a joint request to United States Citizenship and Immigration Services ("USCIS") pursuant to the Freedom of Information Act ("FOIA")[1] and DHS's FOIA regulations[2] (the "Request"), submitted by Human Rights Watch ("HRW") and the American Immigration Council ("Council"), collectively referred to as the "Requesters" (or "we," or "our").

## I.      Request For Information

The Requesters seek all records held by the USCIS Asylum Division and prepared by USCIS asylum officers relating to, and/or mentioning or referring to alleged due process violations or other alleged misconduct by Customs and Border Protection (CBP) (hereinafter called "alleged violations or other alleged misconduct"). "Alleged violations or other misconduct" means any alleged or asserted due process violations; alleged conduct inconsistent or in violation of agency policy or regulations; alleged conduct outside the scope of the law, allegations that CBP failed to record fear of return expressed by migrants at the border; and alleged intimidation, coercion and physical abuse. This request include all records referring to due process violations by CBP agents discovered by asylum officers during credible fear interviews with noncitizens.

---

[1]    5 U.S.C. § 552.

[2]    6 C.F.R. § 5.1 *et seq.*

For the time period beginning on October 1, 2006 and continuing through the present day, individual-level data on records of alleged violations or misconduct committed by CBP staff with variables about each instance of such violations or misconduct including but not limited to:

    i.   The date the instance of an alleged violation or other misconduct was recorded;

    ii.   The date on which the alleged violation or other misconduct occurred;

    iii.   Border Patrol station or CBP port of entry in which the alleged violation or other misconduct took place;

    iv.   Border Patrol sector in which the alleged violation or other misconduct took place;

    v.   Nationality of the person who the record alleges suffered as a result of the alleged violation or other misconduct;

    vi.   Immigration status of the person who the record alleges suffered as a result of the alleged violation or other misconduct;

    vii.   Age or date of birth of the person who the record alleges suffered as a result of the alleged violation or other misconduct;

    viii.   Gender of the person who the record alleges suffered as a result of the alleged violation or other misconduct

    ix.   The nature of the due process alleged violation or other misconduct, including a full description of the allegation

    x.   All communications between asylum officers and the Asylum Division headquarters regarding the alleged violation or other misconduct committed by CBP.

We request electronic copies of this data in a workable format, such as Excel, pursuant to 5 U.S.C. § 552 (a)(3)(C), but we also seek all records, as defined above, which respond to this request. We also request that we receive current translation files for any fields containing coded entries.

## II.    Request For Public Interest Fee Waiver

The Requesters respectfully request a waiver of fees to process this Request. The Requesters are entitled to a fee waiver if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."[3]  The Request meets this standard, and the Requesters are thus entitled to a fee waiver.

---

[3]    5 U.S.C. § 552 (a)(4)(A)(iii); 6 C.F.R. § 5.11(k)(1).

A. The Requesters are primarily engaged in disseminating information in order to inform the public about actual or alleged government activity.

DHS regulations set forth four factors to determine whether the disclosure of information is in the public interest: (1) whether the subject of the requested record concerns the operations or activities of the government; (2) whether the disclosure is likely to contribute to an understanding of government operations or activities; (3) whether the disclosure of the requested information will contribute to public understanding; and (4) whether the disclosure is likely to contribute "significantly" to public understanding of government operations or activities.[4]  This Request is subject to a fee waiver because it satisfies all four factors.

1. The requested Information concerns the operations and activities of the government.

The Requesters seek information that would illustrate how the United States immigration officers with CBP are treating asylum seekers. This implicates operations within the DHS, a government agency. The requested information, therefore, clearly concerns the operations and activities of the government.

2. Disclosure of the requested Information is likely to contribute to an understanding of government operations and activities.

This factor focuses on whether this Request will result in disclosure of meaningful Information that is not already public knowledge.[5]  The information sought by the Requesters is not in the public domain.[6] Without disclosure of the Information, it is difficult, if not impossible, for the public to clearly understand the subject government activities.

Second, this Request concerns Information that is of significant value to the public. The Requesters seek to obtain and synthesize information about the characteristics and handling of instances of alleged misconduct and/or due process violations committed by CBP officials. The general public will gain meaningful understanding of government policies and practices relating to treatment of migrants at U.S. borders.[7]  Among other things, the requested information will inform the public on the procedures for referring asylum seekers to credible fear interviews to assess their asylum claims. The requested information, therefore, is likely to contribute to an understanding of government operations and activities.

---

[4]   6 C.F.R. § 5.11(k)(2)(i)-(iv).

[5]   6 C.F.R. § 5.11(k)(2)(ii); *see also Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Health & Human Servs.*, 481 F. Supp. 2d 99, 106 (D.D.C. 2006) (same).

[6]   *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1315 (D.C. Cir. 2003) (granting fee waiver where "nothing in the record before us suggests that the [information] has been disclosed to anyone").

[7]   *See Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Health & Human Servs.*, 481 F. Supp. 2d 99, 109 (D.D.C. 2006) (finding that public will gain meaningful information through request about "the individuals and organizations that influence, or attempt to influence, public opinion regarding HHS and its policies and programs").

3.   Disclosure of the requested Information will contribute to public understanding.

This factor concerns how the requester will convey the information to the general public.[8] Courts will consider the requester's expertise in the subject area, and its ability to convey information to a reasonably broad audience interested in the subject matter.[9]   First, the Requesters have significant experience in conducting research and disseminating information relating to human rights.   HRW is an international organization that employs over 400 professionals, including journalists, lawyers, and academics.   Similarly, the Council employs dedicated staff focused on advocating for sensible and humane immigration policies through targeted research and publications.   These professionals work to uncover and report on human rights issues and immigration issues in the U.S. and around the world, often analyzing and disseminating information obtained through FOIA requests.[10]

Second, the Requesters have the capacity to disseminate the information gained from this request to a broad audience, making it available in print and on their respective websites.[11]   Each of the Requesters publishes detailed reports[12] and issues press releases.[13]   HRW and the Council regularly publish op-eds and blogs on their websites.[14]   The Requesters also use their extensive media contacts to draw greater attention to the information they disseminate.[15]   In this case, the

---

[8]   6 C.F.R. § 5.11(k)(2)(iii); *see also Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Whether the releasable records are likely to contribute to the general public's understanding of the agency's operations or activities (*e.g.*, how will the requester convey the information to the general public) . . . ."); *Nat'l Sec. Counselors v. Dep't of Justice*, No. 13-CV-0556 (TSC), 2015 WL 674289, at *10 (D.D.C. Feb. 18, 2015) ("In evaluating this factor, '[a] requester's expertise in the subject area and ability and intention to effectively convey information to the public shall be considered.'") (quoting 28 C.F.R. 16.11(k)(2)(iii)).

[9]   6 C.F.R. § 5.11(k)(2)(iii).

[10]   *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) (holding that plaintiff satisfied its burden where it "described several methods it uses to make information available to the public [and] it has a record of conveying to the public information obtained through FOIA requests, and it has stated its intent to do so in this case").

[11]   *See Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Health & Human Servs.*, 481 F. Supp. 2d 99, 116 (D.D.C. 2006) (plaintiff demonstrated intent and capacity to disseminate through reports, memoranda, and its website).

[12]   *Reports*, HUMAN RIGHTS WATCH, http://www.hrw.org/publications/reports; *Research and Publications*, AMERICAN IMMIGRATION COUNCIL, http://www.immigrationpolicy.org/research-publications.

[13]   *News Releases*, HUMAN RIGHTS WATCH, http://www.hrw.org/news/list/40 (last visited June 22, 2015); *Press Releases*, AMERICAN IMMIGRATION COUNCIL, http://www.americanimmigrationcouncil.org/news-media/press-releases.

[14]   *Commentary*, HUMAN RIGHTS WATCH, http://www.hrw.org/news/list/41 (last visited June 22, 2015); *Immigration Impact*, AMERICAN IMMIGRATION COUNCIL. http://immigrationimpact.org.

[15]   From January 1, 2014 to January 1, 2015, Human Rights Watch appeared in Agence France Press 1,257 times, Reuters News 1,917 times, Associated Press Newswires 974 times, All Africa 1,789 times, CNN Newswire 2,185 times, BBC News 468 times, *The Guardian* (UK) 365 times, and *The New York Times* 1,124 times.   Additionally, Human Rights Watch often appears in major US papers such as *The Washington Post, The Wall Street Journal, USA Today, The Pittsburgh Post-Gazette, The Los Angeles Times, The Chicago Tribune,*

Requesters seek the requested information to publish and disseminate a report or other publication(s) to better inform the public and shape government policy concerning the treatment of asylum seekers in expedited removal.  The requested information, therefore, will contribute to public understanding.

        4.     Disclosure of the requested Information is likely to contribute significantly to public understanding of government operations and activities.

This factor concerns the significance of the Information's contribution to the general public's understanding, as compared to the level of public understanding before the disclosure.[16]  This Request concerns the U.S. treatment of asylum seekers at its borders. Significant understanding of government activities will be gained because there is no comparable source of information or analysis of complaints heard by USCIS officers by would-be asylum seekers.[17]  The information is likely to increase the public's understanding by revealing alleged CBP abuses reported to USCIS asylum officers.  This is important to provide insight to the public about how its borders are being managed and operated by each agency, and how its tax dollars are being expended.[18]  This data will also be published in order to increase the public's understanding of the federal government's operations, and to help inform ongoing public and Congressional debate as to where, and to what extent, the United States should be allocating its resources.  The requested Information, therefore, is likely to contribute significantly to public understanding of government operations and activities.

        B.     The Request is not for commercial purposes.

DHS regulations set forth two factors to determine whether the disclosure of information is for commercial purposes:  (1) whether the requester has a commercial interest that would be furthered by the requested disclosure; and (2) if so, whether any identified commercial interest of the requester is sufficiently large, in comparison with the public interest in disclosure, that

---

*The Houston Chronicle*, and others.  Internationally, Human Rights Watch has been cited by *The International Herald Tribune*, *Der Spiegel* (Germany), *The Toronto Star* (Canada), *The Jakarta Post* (Indonesia), *El Pais* (Spain), *Le Monde* (France), *The Sydney Morning Herald* (Australia), *The Times* (London), *Le Progres Egyptien* (Egypt), *Mail and Guardian* (South Africa), *The Ottawa Citizen* (Canada), as well as hundreds of other print news sources around the world. Likewise, the Council has received significant media coverage.  *See, e.g.*, *The Council in the News*, AMERICAN IMMIGRATION COUNCIL, http://www.americanimmigrationcouncil.org/news-media/in-the-news.

[16]  6 C.F.R. § 5.11(k)(2)(iv); *see also Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("The significance of the contribution to the general public's understanding of the agency's operations or activities (*e.g.*, is the information contained in the releasable records already available to the general public)").

[17]  *See Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Health & Human Servs.*, 481 F. Supp. 2d 99, 117 (D.D.C. 2006) (holding that plaintiff fulfilled burden of showing that disclosure will significantly contribute to public understanding in part because "there has been no comparable report specifically addressing what CREW seeks to discover from the requested documents").

[18]  *Prison Legal News v. Lappin*, 436 F. Supp. 2d 17, 26 (D.D.C. 2006) (finding informative value in requested information that would "provide insight to the public about how its federal prisons are being managed and operated, and how its tax dollars are being expended").

disclosure is primarily in the commercial interest of the requester.[19]  This Request satisfies both factors, and thus the Requesters are entitled to a fee waiver.

The Requesters seek the Information in order to publish a report that will educate the public and promote the protection of civil liberties, human rights, and the fair and just administration of the immigration laws.   We do so without a private commercial interest. Each Requester is or represents a nonprofit organization financed through contributions from private individuals, foundations, or a parent institution.  Information gained from the present Request will be analyzed and disseminated by the Requesters without charge to consumers, such as by media reports or freely on their websites. Because the Requesters' primary interest is in distributing useful information to the public, granting a fee waiver in this case would fulfill Congress' legislative intent of liberally construing in favor of waivers of noncommercial requesters.[20]  Our request, therefore, is submitted without a commercial purpose and is entitled to a fee waiver.

## III.    Response

Please submit the requested Information to:

> Clara Long, Researcher
> US Program, Human Rights Watch
> 350 Sansome St., Suite 1000
> San Francisco, CA  94104
> E-mail: longc@hrw.org

## IV.    Certification

We certify that the above statements are true and correct to the best of our knowledge and belief.

*[Signatures on following page]*

---

[19]    6 C.F.R. § 5.11(k)(3)(i)-(ii).

[20]    *See McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1284 (9th Cir. 1987) (quoting 132 CONG. REC. 27, 190 (1986) (Sen. Leahy)) ("Congress amended FOIA to ensure that it be 'liberally construed in favor of waivers of noncommercial requesters'").

Signed:

Clara Long
Researcher, US Program
Human Rights Watch
350 Sansome St., Suite 1000
San Francisco, CA  94104
E-mail: longc@hrw.org


Guillermo Cantor
Deputy Director for Research
American Immigration Council
1331 G Street NW
Washington, DC  20005
E-mail: gcantor@immcouncil.org

Human Rights Watch / American Immigration Counsel FOIA Appeal
Reference No. COW2015000978

# EXHIBIT B

U.S. **Department of Homeland Security**
National Records Center
P.O. Box 648010
Lee's Summit, MO  64064-8010



**U.S. Citizenship
and Immigration
Services**

November 24, 2015

**COW2015000978**

Clara Long
US Program, Human Rights Watch
350 Sansome St., Suite 1000
San Francisco, CA 94104

Dear Clara Long:

We received your request for information relating to USCIS asylum records of due process violations or misconduct by Customs and Border Patrol on November 24, 2015. The time frame for records sought is October 1, 2006 to present. You have specifically requested the following information in a workable format, such as Excel:

- The date the instance of an alleged violation or other misconduct was recorded;
- The date on which the alleged violation or other misconduct occurred;
- Border Patrol station or CBP port of entry in which the alleged violation or other misconduct took place;
- Border Patrol sector in which the alleged violation or other misconduct took place;
- Nationality of the person who the record alleges suffered as a result of the alleged violation or other misconduct;
- Immigration status of the person whom the record alleges suffered as a result of the alleged violation or other misconduct;
- Age or date of birth of the person who the record alleges suffered as a result of the alleged violation or other misconduct;
- Gender of the person who the record alleges suffered as a result of the alleged violation or other misconduct;
- The nature of the due process alleged violation or other misconduct, including a full description of the allegation,
- All communication between asylum officers and the Asylum Division headquarters regarding the alleged violation or other misconduct committed by CBP.

Your request is being handled under the provisions of the Freedom of Information Act (5 U.S.C. § 552). It has been assigned the following control number: COW2015000978. Please cite this number in all future correspondence about your request.

In accordance with Department of Homeland Security Regulations (6 C.F.R. § 5.4(a)), USCIS uses a "cut-off" date to delineate the scope of a FOIA request by treating records created after that date as not responsive to that request. Therefore, in determining which records are responsive to your request, we will only include records in the possession of this agency as of November 24, 2015, the date we began the search for records.

**www.uscis.gov**

COW2015000978
Page 2

We respond to requests on a first-in, first-out basis and on a multi-track system. Your request has been placed in the complex track (Track 2). You may wish to narrow your request to a specific document in order to be eligible for the faster track. To do so, please send a written request, identifying the specific document sought, to the address above. We will notify you if your request is placed in the simple track.

In accordance with Department of Homeland Security Regulations (6 C.F.R. § 5.3(c)), your request is deemed to constitute an agreement to pay any fees that may be chargeable up to $25.00. All applicable fees under 6 C.F.R. §5.11 may be charged. Your request for a fee waiver has been granted.

Because of unusual circumstances we may not be able to process your request within the statutory time limit, therefore, it will be necessary to extend the time limit for processing beyond the ten working day extension period due to the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request. You may wish to modify your request so that it can be processed within the statutory time limit or arrange an alternative time period with our office. Regardless of any delay, your FOIA/PA request will be complied with as accurately as possible.

This office will be providing your records on a Compact Disc (CD) for use on your personal computer. The CD is readable on all computers through the use of Adobe Acrobat software. A version of Adobe Acrobat will be included on the CD. Your records can be viewed on your computer screen and can be printed onto paper. Only records 15 pages or more are eligible for CD printing. To request your responsive records on paper, please include your control number and write to the above address Attention: FOIA/PA Officer, or fax them to (816) 350-5785.

You may check the status of your FOIA request online, at www.uscis.gov. Click on "FOIA Request Status Check" located on the left side of the web page under "Other Services", and follow the instructions. Please be aware that the National Records Center no longer accepts FOIA/PA related questions directly by phone.

All FOIA/PA related requests, including address changes, must be submitted in writing and be signed by the requester. Please include the control number listed above on all correspondence with this office. Requests may be mailed to the FOIA/PA Officer at the PO Box listed at the top of the letterhead, or sent by fax to (816) 350-5785. You may also submit FOIA/PA related requests to our e-mail address at uscis.foia@uscis.dhs.gov.

Sincerely,

Jill A. Eggleston
Director, FOIA Operations

Human Rights Watch / American Immigration Counsel FOIA Appeal
Reference No. COW2015000978

# EXHIBIT C



**U.S. Department of Homeland Security**
National Records Center
P.O. Box 648010
Lee's Summit, MO 64064-8010

**U.S. Citizenship
and Immigration
Services**

December 13, 2016                                      COW2015000978

Clara Long
US Program, Human Rights Watch
350 Sansome St., Suite 1000
San Francisco, CA 94104

Dear Clara Long:

This is in response to your Freedom of Information Act/Privacy Act (FOIA/PA) request received in this
office November 24, 2015 regarding USCIS asylum records of due process violations or misconduct by
CBP.

We have completed the review of all documents and have identified 229 pages that are responsive to your
request. Enclosed are 54 pages released in their entirety and 174 pages released in part. We are
withholding 1 page in full. In our review of this page, we have determined that it contains no reasonably
segregable portion(s) of non-exempt information. We have reviewed and have determined to release all
information except those portions that are exempt pursuant to 5 U.S.C. § 552 (b)(5), (b)(6), and (b)(7)(C)
of the FOIA.

Exemption (b)(5) provides protection for inter-agency or intra-agency memoranda or letters, which would
not be available by law to a party other than an agency in litigation with the agency. The types of
documents and/or information we have withheld under this exemption may consist of documents
containing pre-decisional information, documents or other memoranda prepared in contemplation of
litigation, or confidential communications between attorney and client.

Exemption (b)(6) permits the government to withhold all information about individuals in personnel,
medical and similar files where the disclosure of such information would constitute a clearly unwarranted
invasion of personal privacy. The types of documents and/or information we have withheld may consist
of birth certificates, naturalization certificates, drivers' licenses, social security numbers, home addresses,
dates of birth, or various other documents and/or information belonging to a third party that are
considered personal.

Exemption (b)(7)(C) provides protection for personal information in law enforcement records, which
could reasonably be expected to constitute an unwarranted invasion of personal privacy. We have
withheld information relating to third-party individuals. The types of documents and/or information we
have withheld could consist of names, addresses, identification numbers, telephone numbers, fax
numbers, or various other documents that are considered personal.

COW2015000978
Page 2

As a matter of administrative discretion, we are releasing computer codes found on system screen prints previously withheld under exemption b(2). There may be additional documents that contain discretionary releases of exempt information.  We will identify discretionary releases within the record.  These discretionary releases do not waive our ability to invoke applicable FOIA exemptions for similar or related information in the future.

The enclosed record consists of the best reproducible copies available.  Certain pages may contain marks that appear to be blacked-out information. Such black marks would have been present prior to our receipt of the file and are not information we have withheld under the provisions of the FOIA or PA.

If you wish to appeal this determination, you may write to the USCIS FOIA/PA Appeals Office, 150 Space Center Loop, Suite 500, Lee's Summit, MO 64064-2139, within 90 days of the date of this letter. Both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

The National Records Center does not process petitions, applications or any other type of benefit under the Immigration and Nationality Act.  If you have questions or wish to submit documentation relating to a matter pending with the bureau, you must address these issues with your nearest District Office.

All FOIA/PA related requests, including address changes, must be submitted in writing and be signed by the requester.  Please include the NRC number listed above on all correspondence with this office. Requests may be mailed to the FOIA/PA Officer at the PO Box listed at the top of the letterhead, or sent by fax to 816-350-5785.  You may also submit FOIA/PA related requests to our e-mail address at uscis.foia@uscis.dhs.gov.

Sincerely,

Jill A. Eggleston
Director, FOIA Operations

Enclosure(s)

Human Rights Watch / American Immigration Counsel FOIA Appeal
Reference No. COW2015000978

# EXHIBIT D

(b)(6)

Here is are the interview notes attached and relevant part pasted below. (Additionally the applicant indicated several times through the interview that the CBP officer had told her that he needs no details, at times when it appears that the applicant had attempted to clarify her statements).

On January 17, 2016 you had an interview with a CBP officer, do you recall that interview?
Yes in San Ysidro, CA

To confirm, that interview was in Spanish correct?

1

Yes and I hardly understood the officer.

It seems though that despite having difficulty understanding the officer you were able to communicate at length and you provided detailed information to the officer, please explain how possible?
One of the questions I did not understand I said yes to he became upset with me, and he made me cry too.

What was the issue over which the officer became upset and made you cry?
Officer asked me if I have entered illegally and I said yes.  And he insulted me and told me I am just lying, all of these are lies and he said " I will just go ahead and deport you" and then I responded that whatever he does will be at his conscience.          (b)(6)

2

162

Human Rights Watch / American Immigration Counsel FOIA Appeal
Reference No. COW2015000978

# EXHIBIT E

Excerpt

> Q. If you are afraid to return to your country, then why did you say you were NOT afraid to
> return to your country when you were first arrested and questioned in the US?
> He asked me if I fear tortured or harm at the hands of my government; I don't; I only fear the
> gangs or extortionist, I don't feel my government

**FEAR OF PERSECUTION OR TORTURE:**

**Q. If you are sent back to Honduras, do you fear that you will be persecuted or tortured by
your government?**

**A. Yes, I fear the local gangs.**

> Q. Why did you tell the Border Patrol officer when you were apprehended that you were coming
> to live and look for work in Virginia and you were not afraid to return to your country?
> A. Well because I was in the igloo and they told me that if I didn't sign my deportation they
> would keep me there for several days.
>
> Q. Any other reason?
> A. No.
>
> Q. Did you told the Border Patrol Officer you were coming to live and look for work in
> Virginia?
> A. No.
>
> Q. What did you told the Border Patrol when they apprehended you were your intentions to
> come to the United States?
> A. To seek protection.

Q    When you were apprehended and interviewed by an immigration official, did you tell the official that
     you were afraid to return to your country?

     A   I did tell them, but they did not listen to me.

**Additional Questions**

**Q. When CBP apprehended you in Texas, you did not tell them you were afraid to return to El Salvador. Why not?**
**A. They did not give me the opportunity.**

Q. Government records indicate that when you first talked to the border patrol you
indicated your purpose for coming to the US was to find work in Houston, TX can you
explain?
A. I said I was going to try and work. I am not going to sit here and do nothing

Q. Government records indicate that when you first talked to the border patrol you
indicate you were planning to return to your country in ten years, can you explain?
A. I told him ten years give or take and then I could move to a smaller town where they
look after each other more.

Q. Government records indicate that when you first came to the United States you did not
indicate having a fear of returning to your country and signed documents attesting to this,
but now you express a fear of returning can you explain?
A. He asked me if I was afraid of the government and I said no

Q: Do you remember when the officer asked if you wanted to return to your home country?
A: The officer asked me if I feared rerunning because of politics.

Q. Why did you tell BP officer that that you were not afraid to return to your country?
A. Because the government and the politics don't involve me and he said to answer him to the questions he was asking

Q: Then when the officer asked you what your purpose was in coming to the US, why did you say that it was to work in Virginia?
A: I said I was coming to Virginia, but not to work.

): What did you tell the primary officer when you arrived at the port of entry in Laredo, Texas?
\: Political Asylum.

): Do you fear your government of Honduras?
\: No.

): Have you been threatened by your government because of your race?
\: No.

): Have you been threatened by your government because of your religion?
\: No.

): Have you been threatened by your government because of your political views?
\: No.

): Why are you asking for political asylum?
\: I left my country of Honduras because I was threatened by some people that killed my neighbor told me that I was going to be killed.

Q: When you were apprehended at the border, you had an interview with an agent. Why did you not tell the officer that you were afraid to go back to your country?
A: Supposedly because he spoke to me in English and he said everything is fine, nothing happens here.

Q: Sir, I'm a little confused. The officer interviewed you in Spanish and asked you if you were afraid to return to El Salvador and you said no. But today you are saying that you are afraid. Can you tell me why you told him something different?
A: I am afraid, honestly. I am telling you I am afraid. I told him I am afraid and he asked why, and I said because of the gangs and he said that does not mean anything here.

FEAR OF PERSECUTION OR TORTURE:
Q. If you are sent back to your country, do you fear that you will be persecuted or tortured by your government?
A. Not by the government but I am afraid of the gangs.

FEAR OF PERSECUTION OR TORTURE:
Q. If you are sent back to your country, do you fear that you will be persecuted or tortured by your government?

FEAR OF PERSECUTION OR TORTURE:
Q. If you are sent back to your country, do you fear that you will be persecuted or tortured by your government?
A. No.

**Additional Questions**

Q. When CBP apprehended you in Texas, you did not tell them you were afraid to return to El Salvador. Why not?

A. I did tell them.

Q: Do you know the meaning of Political Asylum?
A: No, I wanted to ask what it is.

Q: Are you a member of any political party in Mexico?
A: No.

Q: Were you being persecuted in your home country of Mexico for political reasons?
A: No.

Q: Do you have any problem with the government of Mexico or with its agencies and institutions?
A: No.

Q: Are you being persecuted by the Mexican government?
A: No.

Q: Were you being persecuted because of your race, religious belief or sexual preference?
A: No.

Q: Okay, please listen to the question. I am not talking about the police in your country. Did you mention the problems you had with Toando to the US border patrol agents in your sworn statement?

A: No, I was nervous.

Q. Government records indicate that when you first talked to the border patrol you indicated your purpose for coming to the US was to find work in Houston, TX can you explain?
A. no I did not tell them that

Q. Government records indicate that when you first talked to the border patrol you indicate you were planning to return to your country in 4years, can you explain?
A. no not at all. I did not say anything

Q. Government records indicate that when you first came to the United States you did not indicate having a fear of returning to your country and signed documents attesting to this, but now you express a fear of returning can you explain?
A. they made me sign the documents and did not say anything

**FEAR OF PERSECUTION OR TORTURE:**

Q. If you are sent back to your country, do you fear that you will be persecuted or tortured by your government?

A. No.

(b)(6)

Q. Would you be harmed or face persecution if you are returned to your native country?
A. No.

Q. Records indicate you came here for work, why are you claiming fear now?
A. I do not recall saying that

Q. Do you recall saying that you came here to look for work in Baltimore, Maryland?
A. I didn't say that

Q. Did make an attempt to enter the United States on April 22, 2014?
A. Yes, we requested asylum with the officer because we wanted to be safe.

Q. Would you be harmed or face persecution if you are returned to your native country?
A. No.

Q. When you were apprehended by Border Patrol you said you came to work, why are you expressing fear now?
A. I also said that I was coming to help my family

Q. You did not express fear at that time, why are you expressing fear now?
A. I told them I was hurt on the motorcycle, they started telling me me a lot of things but I didn't want to say anymore because they were trying to interrogate me.

Q. Why did you tell the Border Patrol interviewer that you did NOT believe that you would be persecuted, tortured or harmed if you were returned to El Salvador?
A. I didn't understand the interpreter.

Q. Why did you say you only intended to stay in the United States for 2 years?
A. I did not say this.

FEAR OF PERSECUTION OR TORTURE:
Q. If you are sent back to your country, do you fear that you will be persecuted or tortured?
A. No.
Q: When border protection asked you if you were afraid to go back to El Salvador, you said no; why did you say no?
A: I did not say no, those questions were not asked from me

Q: Did the border patrol agent read the statement back to you before you signed it?
A: No

Q. Why did you tell the Border Patrol interviewer that you did NOT believe that you would be persecuted, tortured or harmed if you were returned to El Salvador?
A. I told them and he said all the people who come from El Salvador come with the same story but it is true there in the Canton, all the people are leaving for that reason.

Q. So did you mention your fear of being harmed in El Salvador from the beginning?
A. Yes

Q. So why did you say you only intended to stay in the United States for 5 years?
A. Because he told me, no, to sign the deportation because he said even my cousin told him that she was coming because of the maras, and he said no, all the El Salvadorans come with the same lie.

Q. Why did you tell the Border Patrol officer that you were NOT afraid to return to El Salvador?
A. I did not tell him that. I told him that I did not want to sign anything.

Q. Why did you tell the Border Patrol Officer that your reason for leaving El Salvador and coming to the United States was to find work?
A. No, I did not tell him that.

Q. Why did you tell the Border Patrol officer that you were NOT afraid to return to Nicaragua?
A. I thought that they were going to kick us out.

Q. Why did you tell the Border Patrol Officer that your reason for leaving Nicaragua and coming to the United States was to find work?
A. Well, because really that is the reason that I came here to better myself.

Q. If you are sent back to your country, do you fear that you will be persecuted or tortured?
A. No.

Q: Do you have any fear of persecution or torture should you be removed from the United States?
A: No.

Q. Our records indicate you told the BP officer that you left your home country to look for work. Is this correct?
A. I said because of fear.

Q. Why did you tell BP officer that that you were not afraid to return to your country?
A. I told them, I had a fear.

Q. Why did you tell the Border Patrol interviewer that you did NOT believe that you would be persecuted, tortured or harmed if you were returned to El Salvador?
A. I said, I had a fear because I received threats.

Q. Why did you say you only intended to stay in the United States for 5 years?
A. First, I said, I had no idea. Then he asked me for a concrete time so, I said 5 years.

Q. Why did you say that your reason for entering the United States was to look for work?
A. I said, I was coming here to work as well.

Q. Why did you tell the Border Patrol interviewer that you did NOT believe that you would be persecuted, tortured or harmed if you were returned to El Salvador?
A. I was very nervous and I didn't understand

Q. What was the purpose for your entry into the United States?
A. To save my life.
Q. How long did you intend on staying there?
A. For the rest of my life.

FEAR OF PERSECUTION OR TORTURE:
Q. If you are sent back to your country, do you fear that you will be persecuted or tortured?
A. Yes, because I have received death threats and I was beaten by members of the Mara Salvatrucha gang.

34

Q: when you go to the United States did you tell an official from the US that you were afraid to go back to El Salvador
A: I could hardly hear them when they asked me

Q: so your sole reason of coming to the united States was because you were afraid of being in El Salvador, yet when the officers asked you if you were afraid to return you said no
A: I said yes

Q: you told them you were afraid to return
A: yes at that moment with the I didn't know how to tell them

Q: well they explicitly asked you if you were afraid to go back to el Salvador and you said no
A: at that moment I was all nervous and I didn't feel well and I didn't hear what they were asking

Q: what about when the officers gave you a sheet written in Spanish telling you that you could apply for asylum if you were afraid to return to El Salvador
A: yes I read it and that was when they sent me to the other jail and I asked for asylum

Q: but you said no on this sheet, I have it checked off right here
A: at that moment I was very nerovious and I didn't hear what they said

Q: they gave you a sheet, so they weren't actually reading it to you
A: I hardly know how to read and write it is very little that I can

## Q. Government records indicate that when you first came to the United States you did not indicate having a fear of returning to your country and signed documents attesting to this, but now you express a fear of returning can you explain?
## A. I did not know anything about asylum

### Q. Government records indicate that when you first talked to the border patrol you indicated your purpose for coming to the US was to find work in New York, can you explain?
### A. I told them the reason I was coming is they killed a friend of mine, but they did not allow me to explain.

### Q. Government records indicate that when you first talked to the border patrol you indicate you were planning to return to your country in 4 years, can you explain?
### A. I did not say anything like that

### Q. Government records indicate that when you first came to the United States you did not indicate having a fear of returning to your country and signed documents attesting to this, but now you express a fear of returning can you explain?
### A. from the beginning I said I was afraid of returning to my country.

FEAR OF PERSECUTION OR TORTURE:
Q. If you are sent back to your country, do you fear that you will be persecuted or tortured?
A. Yes, the gangs are killing people where I work.

Q. If you are sent back to your country, do you fear that you will be persecuted or tortured?
A. No.

(b)(6)

Q. If you are sent back to your country, do you fear that you will be persecuted or tortured?
A. Yes.

SUBJECT REFUSED TO S[  ]

Q. Government records indicate that when you first talked to the border patrol you indicated your purpose for coming to the US was to find work in Houston, TX can you explain?
A. Yes at that moment I was nervous and I was very tired. They told me to tell the truth and part of my truth is to work and give my children a better life

Q. Government records indicate that when you first talked to the border patrol you indicate you were planning to return to your country in 3 years, can you explain?
A. that is not true I said as long as the Lord allows me to

Q. Government records indicate that when you first came to the United States you did not indicate having a fear of returning to your country, but now you express a fear of returning can you explain?
A. Yes you are right, but at the moment I was confused, frustrated and not thinking clearly

Q. If you are sent back to your country, do you fear that you will be persecuted or tortured?

A. Yes.

Q: When you were stopped at the border did they ask if you were afraid of persecution or torture if you return?
A: Yes. Because I was tired and nervous I don't remember what I told them but I did say I was afraid to go back.

Q: What did you declare to the primary CBP Officer when you applied for admission into the United States?
A: I told the officer that I was asking for help and for political asylum.

Q: What did you say to the U.S. Customs Official?
A: We need help.

Q. So why did you tell them that you had been harassed at your residence because of your religion, but you have not told me that today?
A. Well I did not tell them that

Q. If you are sent back to your country, do you fear that you will be persecuted or tortured?
A. No.

FEAR OF PERSECUTION OR TORTURE:
Q. If you are sent back to your country, do you fear that you will be persecuted or tortured?
A. No.

Subject Refused To Sign

Q. Why did you tell the Border Patrol officer that you were NOT afraid to return to El Salv
A. I said that I was afraid to return and I was going to tell him why but he would not listen
me.

- 5 -

ALIEN NUMBER: A206 722 184                          DATE: 6/6/2014
NAME: Rosmery Yamileth CHEVEZ-ULLOA               COUNTRY: El Salvador
ASYLUM OFFICER: Daniel A. Phillips ZHN075        ASYLUM OFFICE: ZHN

Q. Why did you tell the Border Patrol Officer that your reason for leaving El Salvador and
coming to the United States was to find work?
A. I did not tell him that.

Q. When you were first interviewed by immigration officials, you testified you came to the US
for the purpose of working in New York.  Why did you say that?
A. No, I said that I was afraid

Q. You were also asked if you had any fear of returning to your country and you said no.  Why
didn't you express a fear at that time?
A. I said I was afraid of the gang

Q. I am looking at your immigration forms, and why sign your name to the responses that I
mentioned that you gave to the first immigration officials?
A. I do not know

FEAR OF PERSECUTION OR TORTURE:
Q. If you are sent back to your country, do you fear that you will be persecuted or
tortured?
A. No.

(b)(6)

Q. If you are sent back to your country, do you fear that you will be persecuted or
tortured?
A. No.

Q. Why did you tell immigration officials that you had no fear of returning to your country, you
came here to live and work in Maryland?
A. No I didn't tell them I was afraid, they didn't even ask me about that.

FEAR OF PERSECUTION OR TORTURE:
Q. If you are sent back to your country, do you fear that you will be persecuted or
tortured by your government?
A. No.

Q. Do you have any fear or concern about being returned to your home country or being removed from the United States?
A. NO.

(b)(6)

Q. Would you be harmed if you are returned to your home country or country of last residence?
A. NO.

Human Rights Watch / American Immigration Counsel FOIA Appeal
Reference No. COW2015000978

# EXHIBIT F

**Elana's** story is emblematic of this problem. When Elana and her two-year-old son first arrived at the Dilley detention center after being detained on August 26, 2015, she informed officials that she spoke Mam, an indigenous Mayan language spoken by half a million Guatemalans, and that her religion was Mam. But during the three weeks that she and her two-year-old son spent in detention, neither ICE nor Corrections Corporations of America (CCA) (the private prison contractor operating the Dilley detention center) staff communicated with her in Mam. ICE never found a Mam interpreter for Elana or gave her any documents written in Mam. Instead, ICE officers explained the immigration process to her in Spanish, which she could barely understand. She communicated with her deportation officer largely through pantomime. ICE officials, in turn, did not understand Elana when she asked them in Mam for her immigration documents, and so she went without this important paperwork for days. This delay impeded her attorney's ability to represent her and extended her time in detention.

Even when interpretation is available, indigenous language speakers are often detained longer than Spanish speakers. **Noemi** and her eleven-year-old child were detained at the Karnes detention center in late September 2015. After this, she was given a credible fear interview in her native language, K'iche. However, she had to wait longer for the results than her Spanish-speaking counterparts. When ICE finally called Noemi into a meeting to discuss the positive results of her interview and the terms and conditions of her release, no interpretation was available. Consequently, the meeting was adjourned and she was forced to wait five additional days, until interpretation became available, for the results of her credible fear interview.

In some instances, CARA Project staff and volunteers witnessed or received reports of the use of children or other residents in communications between ICE or CCA officials and detained indigenous language speakers. Of course, such interpretation in the context of individuals applying for asylum, withholding of removal, or protection under Convention Against Torture are completely inappropriate. Mothers resist sharing details of abuse, torture, sexual assaults, and humiliation with their children; children and teenagers withhold such information from their parents. It is also possible that members of one family may be, or have been, involved in the persecution of another family's members, who are detained in the same ICE detention center. Confidentiality must be an essential aspect of claims for asylum or related claims for refugee status.[14] Although USCIS has made very clear that family members or friends will be used as interpreters only as a very last resort, this arrangement is very problematic. If no other interpreter is available, DHS should issue Notices to Appear rather than subjecting these families to the expedited removal process without adequate interpretation.

**Additional barriers in accessing medical treatment**

---

Secretary Jeh Johnson, July 24, 2015, available at https://www.aap.org/en-us/advocacy-and-policy/federal-advocacy/Documents/AAP%20Letter%20to%20Secretary%20Johnson%20Family%20Detention%20Final.pdf (last visited Dec 7, 2015); Luis Zayas and Aimee Miller, Special to the Statesman, *Immigrant Detention Centers Harm Childrens' Mental Health,* The Statesman (Aug. 13, 2015), available at http://www.statesman.com/news/news/opinion/immigrant-dentention-centers-harm-childrens-mental/nnJQp/ (last visited Nov. 11, 2015).
[14] *See* 8 C.F.R. § 1208.6(a).

Human Rights Watch / American Immigration Counsel FOIA Appeal
Reference No. COW2015000978

# EXHIBIT G

Hi ,

Per your request, I'm sending you this sampling of cases which document alleged CBP abuses from an experienced APSO officer. Unfortunately , since our office was deluged by South west border inland cases we haven't had the time to properly document many such cases. But we regularly hear anecdotal stories of applicants being placed in "coolers" or  "the refrigerator," of CBP not questioning applicants, or  border patrol engaging in threats or improper force.  We will encourage new officers to take the time to develop the record on these issues and properly document such potential abuses.



**From:** ▮▮▮▮▮▮▮
**Sent:** Tuesday, October 01, 2013 12:10 PM
**To:** ▮▮▮▮▮▮▮▮▮▮
**Cc:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** CBP due process (and other) violations

Hi ,

Here are 5 pretty good samples of the issues that I think we need to raise as far as CBP training recommendations. I am attaching the memos to file but I think that the I-870s are very helpful as well because they have the Q and A I took.

A▮▮▮▮▮  (Non-detained CF interview, represented by HR First in NYC, applicant testified to very poor CBP and ICE mistreatment in detention, room was so cold that her feet were turning blue, stripped naked and left in solitary confinement.)

A▮▮▮▮▮  (Told by CBP officer that she cannot apply for asylum based on domestic violence)

A▮▮▮▮▮▮  (Arrived EWI with minor child.  CBP Q&A conflicts with testimony, applicant refused to sign Q & A done by CBP because of the coercive and hostile nature of the interview with CBP.)

A▮▮▮▮▮  (Chinese national arrived EWI at border and detained in group of 4 Chinese nationals)  During interview on credible fear he claimed to fear Chinese Family Planning Policy however border interview done by CBP says that he is a Christian.  When asked about this discrepancy he indicated that the other 3 Chinese nationals he arrived with were interviewed but he was not interviewed at all.  The other 3 were all claiming to be Chinese Christians.  He was apparently processed in group and never actually asked any of the questions.  EARM has a note from CBP that he was in a group of 4 so it appears to verify at least part of what he is alleging.  *This may indicate that people are not always interviewed or asked any of the questions by CBP.*

A▮▮▮▮▮  (Non-detained CF applicant with CBP Q and A that did not contain her claimed fear at the border.)  When asked about this issue, she indicated that she asked CBP if she could get an attorney and they told her that she had to go home no matter what.  She feared having to stay longer in the freezing room where everyone was detained by CBP so everyone just does what they can to get out of the cold room.  A man in front of her in line told CBP officers that he was afraid of the gangs in Central America and he was yelled at by CBP and called a liar.

I have other examples, but I need more time to dig them up.  These are sort of the garden variety of complaints I have gotten and hit on possible training areas that CBP could look at.

▮▮▮▮▮▮▮▮▮
Asylum Officer
Newark Asylum Office (ZNK)
1200 Wall Street West, 4th FLR

3

Human Rights Watch / American Immigration Counsel FOIA Appeal
Reference No. COW2015000978

# EXHIBIT H

18 year-old applicant I interviewed today alleges that he was **punched in the forehead once very hard, knocking him down, by a U.S. official** involved in his apprehension after he crossed the river into U.S. in Texas. He indicated that he was he was brought to [detention] and photographed and asked about what happened.  He was offered to write a statement on a computer, but he declined because he was scared.  He indicated the place he was hit was swollen.  I cannot easily see whether there is any mark/swelling in the photo in EARM.  Our records do not indicate any marks/scars/medical/evidence of trauma.  He was 16 at time of entry.

The attorney Rosa Soy indicated she first heard about this this morning from the applicant prior to the interview.

Please advise as to any actions needed related to this allegation.  He may very well be telling the truth about what happened.

(b)(6)

Human Rights Watch / American Immigration Counsel FOIA Appeal
Reference No. COW2015000978

# EXHIBIT I

| A# | BP Officer | BP Station | Date of Sworn Statement |
|---|---|---|---|
| (b)(6) | | Los Angeles, CA | 3/14/2014 |
| | | San Ysidro, CA | 1/20/2014 |
| | | Fabens, TX | 11/4/2013 |
| | | Ysleta PCS El Paso, TX | 4/5/2014 |
| | | Paso del Norte, El Paso, TX | 1/28/2014 |
| | | Ysleta, El Paso, TX | 2/1/2014 |
| | | San Diego, CA | 10/17/2013 |
| | | San Ysidro, CA | 3/16/2014 |
| | | San Diego, CA | 1/10/2014 |
| | | Fabens, TX | 11/4/2013 |
| | | San Ysidro, CA | 4/10/2014 |
| | | Otay Mesa, CA | 1/25/2014 |
| | | Ysleta, El Paso, TX | 1/10/2014 |
| | | Nogales, AZ | 3/27/2014 |
| | | Casa Grande, AZ | 1/22/2014 |
| | | Hidalgo, TX | 1/25/2014 |
| | | San Ysidro, CA | 11/9/2013 |
| | | San Ysidro, CA | 11/24/2013 |
| | | McAllen, TX | 12/2/2013 |
| | | West Palm Beach, FL | 3/3/2014 |
| | | Eagle Pass South | 10/10/2013 |
| | | San Ysidro, CA | 2/24/2014 |
| | | Bakersfield, CA | 4/16/2014 |
| | | San Ysidro, CA | 3/31/2014 |

| (b)(6) | | |
|---|---|---|
| | Laredo North, TX | 10/18/2013 |
| | Laredo North, TX | 10/19/2013 |
| | Laredo North, TX | 10/21/2013 |
| | Laredo North, TX | 10/25/2013 |
| | Laredo North, TX | 10/25/2013 |
| | Eagle Pass, TX | 11/9/2013 |
| | Eagle Pass South | 11/13/2013 |
| | Eagle Pass South | 11/25/2013 |
| | Eagle Pass South | 11/25/2013 |
| | Carrizo Springs, TX | 12/28/2013 |
| | Laredo North, TX | 11/1/2013 |
| | Laredo North, TX | 11/7/2013 |
| | Laredo North, TX | 11/14/2013 |
| | Laredo South, TX | 11/27/2013 |
| | Laredo North, TX | 12/3/2013 |
| | Laredo North, TX | 12/1/2013 |
| | Laredo North, TX | 12/1/2013 |

| (b)(6) | | |
|---|---|---|
| | Laredo North, TX | 12/2/2013 |
| | Carrizo Springs, TX | 1/19/2014 |
| | Carrizo Springs, TX | 1/19/2014 |
| | Eagle Pass, TX | 12/3/2013 |
| | Eagle Pass South | 12/9/2013 |
| | Eagle Pass, TX | 12/9/2013 |
| | Eagle Pass, TX | 12/9/2013 |
| | Eagle Pass, TX | 12/9/2013 |
| | Eagle Pass, TX | 12/10/2013 |
| | Eagle Pass, TX | 12/18/2013 |
| | Eagle Pass South | 12/29/2013 |
| | Eagle Pass South | 12/29/2013 |
| | Laredo North, TX | 12/4/2013 |
| | Laredo North, TX | 12/4/2013 |
| | Laredo North, TX | 12/7/2013 |
| | Laredo North, TX | 12/8/2013 |
| | Laredo North, TX | 12/10/2013 |
| | Laredo South, TX | 12/11/2013 |
| | Freer, TX BP Station | 2/7/2014 |
| | Freer, TX | 3/5/2014 |
| | Laredo North, TX | 12/14/2013 |

| | | | | | |
|---|---|---|---|---|---|
| | | 1 | | | |
| | | 1 | | | |
| 1 | | | | | |
| 1 | | | | | |
| 1 | | | | | |
| 1 | | | | | |
| | | 1 | | | |
| 1 | | | | | |
| 1 | | | | | |
| 1 | | | | | |
| | | 1 | | | |
| 1 | | | | | |
| | | 1 | | | |
| | | 1 | | | |

| | | | | | |
|---|---|---|---|---|---|
| | | 1 | | | |
| 1 | | | | | |
| 1 | | | | | |
| 1 | | | | | |
| 1 | | | | | |
| | | | 1 | | |
| 1 | | | | | |
| | | | 1 | | 1 |
| | | | | | 1 |
| 1 | | | | | |
| | | 1 | | | |
| 1 | | | | | |
| | | | | | 1 |

| | | | | | |
|---|---|---|---|---|---|
| | | 1 | 1 | | 1 |
| | | | | | 1 |
| 1 | | | | | |
| 1 | | | | | |
| 1 | | | | | |
| 1 | | | | | |
| | | | | | 1 |
| | 1 | | | | 1 |
| | | | 1 | | 1 |
| | | | | | 1 |
| 1 | | | | | |
| 1 | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | 1 | | | | |
| | | | | | 1 |
| | 1 | | | | |
| | 1 | | | | |
| | 1 | | | | |
| 1 | | | | | |
| 1 | | | | | |
| 1 | | | | | |
| | 1 | | | | 1 |
| 1 | | | | | |
| 1 | | | | | |
| | 1 | | | | |
| 1 | | | | | |
| 1 | | | | | |
| 1 | | | | | |
| 1 | | | | | |
| 1 | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | 1 | | | | |
| 1 | | | | | |
| 1 | | | | | |
| | | 1 | | | |
| | | 1 | | | |
| | | | | | 1 |
| | 1 | 1 | 1 | | 1 |
| | | | | | |
| 1 | | | | | |
| 1 | | | | | |
| 1 | | | | | |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  | 1 |  |  |  | 1 |
| 1 |  |  |  |  |  |
| 1 |  |  |  |  |  |
|  |  | 1 |  |  |  |
| 1 |  |  |  |  |  |
|  | 1 |  | 1 |  |  |
|  |  | 1 | 1 |  |  |
| 1 |  |  |  |  |  |
| 1 |  |  |  |  |  |
| 1 |  |  |  |  |  |
|  |  | 1 |  |  |  |
|  |  |  |  | 1 |  |

| | | | | | |
|---|---|---|---|---|---|
| | 1 | | | | |
| | | | | | 1 |
| | | | | 1 | 1 |
| | | 1 | | | |
| | | | | | 1 |
| | | 1 | | | |
| 1 | | | | | |
| 1 | | | | | |
| | | | | 1 | |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | 1 |
| 1 | | | | | |
| 1 | | | | | |
| 1 | | | | | |
| 1 | | | | | |
| | 1 | | | | |
| 1 | | | | | |
| | | 1 | | | 1 |
| 1 | | | | | |
| | 1 | | | | 1 |
| 1 | | | | | |
| 1 | | | | | |
| | | | | | 1 |
| 1 | | | | | |
| 1 | | | | | |
| 1 | | | | | |
| | | | 1 | | 1 |
| 1 | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | 1 | | |
| 1 | | | | | |
| 1 | | | | | |
| | | | | | 1 |
| 1 | | | | | |
| | | 1 | | | 1 |
| | | | | | 1 |
| 1 | | | | | |
| 1 | | | | | |
| 1 | | | | | |
| 1 | | | | | |
| | | | 1 | | |
| | | | | 1 | |
| 1 | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | | 1 | | 1 | |
| 1 | | | | | |
| 1 | | | | | |
| | | 1 | | | |
| | | | | | 1 |
| 1 | | | | | |
| | | | | | 1 |
| | | | | | 1 |
| 1 | | | | | |
| | | | | | 1 |
| 1 | | | | | |

Human Rights Watch / American Immigration Counsel FOIA Appeal
Reference No. COW2015000978

# EXHIBIT J

(b)(6)

Here is are the interview notes attached and relevant part pasted below. (Additionally the applicant indicated several times through the interview that the CBP officer had told her that he needs no details, at times when it appears that the applicant had attempted to clarify her statements).

On January 17, 2016 you had an interview with a CBP officer, do you recall that interview?
Yes in San Ysidro, CA

To confirm, that interview was in Spanish correct?

1

Yes and I hardly understood the officer.

It seems though that despite having difficulty understanding the officer you were able to communicate at length and you provided detailed information to the officer, please explain how possible?
One of the questions I did not understand I said yes to he became upset with me, and he made me cry too.

What was the issue over which the officer became upset and made you cry?
Officer asked me if I have entered illegally and I said yes.  And he insulted me and told me I am just lying, all of these are lies and he said " I will just go ahead and deport you" and then I responded that whatever he does will be at his conscience.          (b)(6)



2

162

**Subject:** RE: Problem

Let's get this one served ASAP.  She needs to get out of there.

**Subject:** Problem

LaSalle Detention Facility, Jena, Louisanna
Honduras

Detainee is having suicidal thoughts and has been having convulsions at night as a result of sexual, physical and emotional abuse by her aunt and uncle in Honduras.  She is on medications for the convulstions. She had attempted suicide in Honduras and is more regularly thinking about it now.  She mentioned that she does not feel the facility pays attention so she has not told them recently of her desire to kill herself while in detention.

1



(b)(6)

(b)(6)

**Subject:** [ ] CF CBP complaint

(b)(6)

Hello,

[ ] spoke to you about this last week but wanted to share with you and my SAO formally in writing. My CF applicant, who came to the United States in order to come out as gay and live with his mother whom he thought would be more understanding than his extended family in El Salvador, was very upset about his interaction with CBP. The interviewing agent was the first person he ever told he was gay, and the applicant testified that the agent made comments, in English, to another officer. I know asylum officers are trained not to make such comments (at all, but especially in front of the applicant) but I am unsure if this conflicts with CBP's training on how to treat LGBT people they apprehend. Below are the relevant questions, and I attached all my docs to this email if you need them:

Before interview, applicant started speaking rapidly in Spanish. The first part was my record of it before the interpreter started interpreting, because I was closing the door and the interpreter was taking a break between interviews.

Applicant: I am so glad you are a woman. The last ones they spoke English and they thought that I didn't understand them but they made fun of me for being homosexual. I only understood  a little but he said WHAT THE FUCK [app said that in English, shouted] really loudly after I said I was homosexual.

Q. I am sorry you experienced that. I am going to ask you more information and record it so I can report that. Do you remember any details? Was this in California were you are now or in Texas when you were caught?
A. They got me in Texas, it was there

Q. remember any other details, like who it was or where you were?
A. No not really. It was like 1 in the morning. The only fed us once. Only 2 burritos.

1

Human Rights Watch / American Immigration Counsel FOIA Appeal
Appeal No. APP2017000293
Reference No. COW2015000978

# ATTACHMENT B

U.S. Department of Homeland Security
HQ FOIA/PA Appeals
150 Space Center Loop, Suite 500
Lee's Summit, MO 64064-2139



U.S. Citizenship
and Immigration
Services

March 14, 2017

**APP2017000293**

Clara Long
US Program, Human Rights Watch
350 Sansome Street, Suite 1000
San Francisco, CA 94104

Dear Ms. Long:

Re: COW2015000978

You appealed the action of the National Records Center regarding your request for access to records pertaining to USCIS asylum records of due process violations or misconduct by CBP, dated November 24, 2015.

I have decided to remand your request to the National Records Center for a further search. If records are located, those that can be released will be made available to you directly by that office.

Sincerely,

Alan D. Hughes, Associate Counsel
Commercial and Administrative Law Division
Department of Homeland Security
Citizenship and Immigration Services

# Exhibit 7

U.S. Department of Homeland Security
HQ FOIA/PA Appeals
150 Space Center Loop, Suite 500
Lee's Summit, MO  64064-2139



**U.S. Citizenship
and Immigration
Services**

March 14, 2017

**APP2017000293**

Clara Long
US Program, Human Rights Watch
350 Sansome Street, Suite 1000
San Francisco, CA  94104

Dear Ms. Long:

Re: COW2015000978

You appealed the action of the National Records Center regarding your request for access to records
pertaining to USCIS asylum records of due process violations or misconduct by CBP, dated November
24, 2015.

I have decided to remand your request to the National Records Center for a further search.  If records are
located, those that can be released will be made available to you directly by that office.

Sincerely,

Alan D. Hughes, Associate Counsel
Commercial and Administrative Law Division
Department of Homeland Security
Citizenship and Immigration Services

**Exhibit 8**

**Schick, Angela**

| | |
|---|---|
| **From:** | Fletes, Christina |
| **Sent:** | Thursday, February 15, 2018 11:04 AM |
| **To:** | 'FOIAPAQuestions@uscis.dhs.gov' |
| **Cc:** | Richards, Matthew |
| **Subject:** | Final Request Regarding FOIA Request COW2015000978/APP2017000293 |

To Whom It May Concern:

I write on behalf of my clients Human Rights Watch ("HRW") and the American Immigration Council ("Council") to inquire about the status of their FOIA request submitted to USCIS on November 17, 2015. The original FOIA Request and National Records Center ("NRC") reference number assigned by USCIS is **COW2015000978**, and the FOIA appeals reference number is **APP2017000293**.

On September 25, 2017 we sent a letter to USCIS FOIA/PA Appeals Office via FedEx and e-mail to inquire about the status of the FOIA request and appeal but did not receive a response.

To date, neither HRW nor the Council has received an update regarding the timing of production, much less actual, additional records.  We therefore request that USCIS immediately identify the status of the appeal including, but not limited to, the anticipated production date.  If we do not receive a response from USCIS by **Friday, February 23, 2018**, we intend file suit in federal district court for violations of 5 U.S.C. § 552.

Thank you for your attention to this matter and for your prompt reply.

Best,



**Christina Fletes**
Associate
cfletes@nixonpeabody.com
T 415-984-8347 | C 415-613-2530 | F 844-813-2847
Nixon Peabody LLP | One Embarcadero Center, 18th Floor | San Francisco, CA 94111-3600
nixonpeabody.com | @NixonPeabodyLLP

**Please consider the environment before printing this email.**

This email message and any attachments are confidential and may be protected by the attorney/client or other applicable privileges. The information is intended to be conveyed only to the designated recipient(s) of the message. If you are not an intended recipient, please notify the sender immediately and delete the message from your email system. Unauthorized use, dissemination, distribution or reproduction of this message by other than the intended recipient is strictly prohibited and may be unlawful. Thank you.